No. 17-1351

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

————————

INTERNATIONAL REFUGEE ASSISTANCE PROJECT, ET AL.,
*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, ET AL.,
*Defendants-Appellants.*

————————

On Appeal from the United States District Court
for the District of Maryland, No. 17-cv-00361 (Chuang, J.)

————————

BRIEF OF *AMICUS CURIAE* NEW YORK UNIVERSITY IN
SUPPORT OF APPELLEES, IN OPPOSITION TO APPELLANTS'
MOTION FOR A STAY AND ON THE MERITS

————————

OF COUNSEL:
TERRANCE NOLAN
GENERAL COUNSEL AND SECRETARY
NEW YORK UNIVERSITY
70 Washington Square South, 11th floor
New York, New York 10012

PROSKAUER ROSE LLP
STEVEN E. OBUS
SETH D. FIUR
TIFFANY M. WOO
11 Times Square
New York, New York 10036
(212) 969-3000
SObus@proskauer.com
SFiur@proskauer.com
TWoo@proskauer.com

*Attorneys for Amicus Curiae*

April 4, 2017

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __17-1351__    Caption: _Int'l Refugee Assistance Project, et al. v. Donald Trump, et al._

Pursuant to FRAP 26.1 and Local Rule 26.1,

_New York University_
(name of party/amicus)

_____

 who is _____amicus curiae_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?  ☐ YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
      If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(a)(2)(B))? ☐ YES ☑ NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)   ☐ YES ☑ NO
     If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?   ☐ YES ☑ NO
     If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Steven E. Obus                          Date:      April 4, 2017

Counsel for: New York University

## CERTIFICATE OF SERVICE
**************************

I certify that on      April 4, 2017      the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Steven E. Obus                                       April 4, 2017
     (signature)                                             (date)

# TABLE OF CONTENTS

INTEREST OF *AMICUS* .............................................................................1

INTRODUCTION AND SUMMARY OF THE ARGUMENT ..............................2

ARGUMENT ............................................................................................4

   I.   A Diverse International Community is Critical to NYU's Identity and Mission..............................................................................................4

   II.  The Executive Order Significantly Harms NYU and Its Constituents............7

   III. The Executive Order Has the Same Unlawful Policy Outcomes as Its Predecessor, In Violation of the Equal Protection Clause, the Establishment Clause and the Immigration and Nationality Act. .........................................15

CONCLUSION .........................................................................................27

i

# TABLE OF AUTHORITIES

**CASES**                                                                                      **PAGE(S)**

*Arce v. Douglas*,
   793 F.3d 968 (9th Cir. 2015) ............................................................................16

*Bery v. City of N.Y.*,
   97 F.3d 689 (2d Cir. 1996) ...............................................................................9

*Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*,
   512 U.S. 687 (1994) ...........................................................................................17

*Bolling v. Sharpe*,
   347 U.S. 497 (1954) ...........................................................................................15

*Church of Lukumi Babalu Aye, Inc. v. Hialeah*,
   508 U.S. 520 (1993) ...........................................................................20, 21, 27

*Clark v. Jeter*,
   486 U.S. 456 (1988) ...........................................................................................16

*Cty. of Allegheny v. ACLU Greater Pittsburgh Chapter*,
   492 U.S. 573 (1989) ...........................................................................................24

*Department of Agriculture v. Moreno*,
   413 U.S. 528 (1973) ...........................................................................................24

*Fisher v. Univ. of Tex. at Austin*,
   133 S. Ct. 2411 (2013) .................................................................................9, 13

*Grutter v. Bollinger*,
   539 U.S. 306 (2003) .......................................................................................8, 9

*Hassan v. City of New York*,
   804 F.3d 277 (3d Cir. 2015) .............................................................................16

*Int'l Refugee Assistance Project v. Trump*,
   No. CV TDC-17-0361, 2017 WL 1018235 (D. Md. Mar. 16, 2017)...........18, 22

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
   385 U.S. 589 (1967) .............................................................................................8

*Larson v. Valente*,
    456 U.S. 228 (1982)................................................................16, 26

*Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*,
    45 F.3d 469 (D.C. Cir. 1995) ...........................................................18

*Lynch v. Donnelly,*
    465 U.S. 668 (1984) .........................................................................24

*McCreary Cty., Ky. v. Am. Civil Liberties Union of Ky.*,
    545 U.S. 844 (2005)...............................................................16, 24, 25

*Miller v. Johnson*,
    515 U.S. 900 (1995).........................................................................25

*Regents of Univ. of Cal. v. Bakke*,
    438 U.S. 265 (1978).......................................................................9, 14

*Romer v. Evans*,
    517 U.S. 620 (1996).....................................................................21, 25

*Sweezy v. New Hampshire*,
    354 U.S. 234 (1957)........................................................................ 14

*Vill. of Arlington Heights v. Metro Hous. Dev. Corp.*,
    429 U.S. 252 (1977).........................................................................16

*Washington v. Trump*,
    847 F.3d 1151 (9th Cir. 2017) ........................................................9, 22

**STATUTES**

8 U.S.C. § 1152(a)(1)(A) ......................................................................18

8 U.S.C. § 1182(f).................................................................................19

Fed. R. App. P. 29(a)(2).........................................................................1

Fed. R. App. P. 29(a)(4)(E)....................................................................1

Immigration and Nationality Act of 1965.........................................*passim*

## INTEREST OF *AMICUS*

*Amicus* New York University ("NYU") is an institution of higher learning headquartered in New York City, with campuses on nearly every continent. A critical component of NYU's global mission is to create an environment that fosters achievement borne of the free exchange of ideas and information. By welcoming and engaging students and scholars from the broadest range of backgrounds and nationalities, NYU is able to advance that mission.

As a global university centered in New York City—one of the world's most internationally diverse cities—NYU has a vital interest in the proper administration, within constitutional limits, of the immigration laws of the United States. NYU is deeply concerned that the Executive Order issued by the President on March 6, 2017, titled "Protecting the Nation from Foreign Terrorist Entry into the United States" (the "Executive Order"), like its immediate predecessor, exceeds those limits. If allowed to stand, it would impair unique educational opportunities that NYU is otherwise able to provide, and thus inflict harm on the university, on its constituents and on the community at large.[1]

---

[1] The parties consent to the filing of this brief, which authorizes NYU to file it pursuant to Fed. R. App. P. 29(a)(2). No counsel for a party authored this brief in whole or in part, and no such counsel or a party contributed money that was intended to fund preparing or submitting this brief. No person other than the *amicus curiae*, its constituents or its counsel contributed money that was intended to fund preparing or submitting the brief. *See* Fed. R. App. P. 29(a)(4)(E).

1

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Thousands of prospective students apply to NYU every year, seeking the opportunity to study at one of the most internationally diverse universities in the world. At the core of NYU's institutional mission are the twin aims of providing an exceptional academic experience for its students and fostering world-class international scholarship. NYU has invested significant resources in developing an environment in which its diverse student body and faculty can thrive, for the benefit of the academic community, the United States, and the world. Implementation of Section 2(c) of the Executive Order would significantly undermine these efforts.[2]

By obstructing the entry of international students, faculty and other scholars into the United States based solely on their having come from one of the Muslim-majority countries singled out for adverse treatment in the Executive Order— without any reason to believe that the individuals are involved at all in any terrorist activity—the Order would gratuitously and unlawfully encumber NYU's ability to conduct its many international programs, which rely on input from faculty and students from the affected countries; impair its ability to transmit its strongly-held values abroad; and obstruct its ability to provide to all of its students the

---

[2] NYU also opposes the implementation of Section 6 of the Executive Order, which seeks to suspend travel of refugees into the United States under the U.S. Refugee Admissions Program for 120 days after the effective date of the Order, and encourages this Court to order the District Court to enjoin its implementation.

educational benefits that flow from a fully diverse student body and faculty.  For these reasons, among others, the motion for a stay pending appeal filed by the Government ("Appellants") should be denied and the District Court's order enjoining Section 2(c) of the Executive Order should ultimately be upheld.

# ARGUMENT

## I.    A Diverse International Community is Critical to NYU's Identity and Mission.

NYU is a "Global Network University," with campuses around the world, including in Africa, Asia, Europe, North America and South America.[3]  These campuses offer to all NYU students a range of multi-disciplinary opportunities for research, teaching and scholarly collaboration.  In addition to developing its own campuses, NYU has partnered with numerous schools worldwide both to create educational opportunities for international students and scholars,[4] and to expose its domestic students to the vast wealth of experience and knowledge that can be gained by traveling, researching and studying abroad.[5]

---

[3] *See* NYU, *The Global Network*, *available at* https://www.nyu.edu/faculty/governance-policies-and-procedures/faculty-handbook/the-university/organization-and-administration/the-global-network.html.

[4] *See Global Academic Partnerships and affiliations*, NYU (March 2, 2016), *available at* https://www.nyu.edu/faculty/global-academic-partnerships-and-affiliations.html (describing global partnerships and affiliations with schools for the humanities, business, medicine, sociology, anthropology, and the arts, located in Accra, Berlin, Buenos Aires, Florence, London, Madrid, Paris, Prague, Sydney, Tel Aviv, and Washington D.C.); *see also Update on Faculty Engagement and Academic Development at the Global Sites (6/11/15 Memo)*, NYU (June 11, 2015), *available at* https://www.nyu.edu/faculty/global-academic-partnerships-and-affiliations/memos/faculty-engagement-june-2015.html (detailing the growth of new collaborative programs with faculty, students, and departments at partnership and affiliate schools).

[5] *See, e.g.*, NYU International Exchange Program, NYU, https://www.nyu.edu/academics/studying-abroad/exchange/internationalexchange.html; Stern IBEX (International Business

4

Attracting to the United States international students and scholars from a wide variety of backgrounds is intrinsic to NYU's success as an educational institution. To that end, NYU has made it a priority to "embrace diversity among faculty, staff and students to ensure a wide range of perspectives, including international perspectives, in the educational experience."[6] Its efforts have been highly successful—in 2015-2016, NYU hosted more international students and scholars than any other university in the United States—approximately 15,000 international students and more than 1,200 international scholars,[7] constituting more than a third of NYU's graduate student population, and nearly a fifth of its undergraduate population. The most creative, talented and industrious members of communities all over the world have at one time called NYU home.[8]

---

Exchange), NYU, https://www.nyu.edu/academics/studying-abroad/exchange/stern-ibex-international-business-exchange.html.

[6] NYU Mission Statement, *available at* www.nyu.edu/about.

[7] NYU Office of Global Services, *Annual Report: September 1, 2015 - August 31, 2016*, *available at* http://www.nyu.edu/content/dam/nyu/globalServices/documents/annualreport/annual%20report.pdf.

[8] Many NYU alumni from foreign countries have gone on to become leaders in their communities. To take but a few examples, NYU alumni Shimon Peres, the ninth President of Israel, and former Egyptian vice president Mohammed Mustafa ElBaradei, both won the Nobel Peace Prize for their contributions to the region targeted by the Executive Order. Working with fellow NYU School of Medicine alumnus Jonas Salk, Albert Sabin developed oral polio vaccines that played a key role in substantially eradicating the disease. More recently, Eric Richard Kandel, who also attended NYU's School of Medicine, was awarded a Nobel Peace Prize for discoveries that paved the way to the modern understanding of memory formation.

NYU's presence in New York City has itself played an integral role in the University's ability to achieve its international mission, proudly "tak[ing] its name and spirit from one of the busiest, most diverse and dynamic cities of all."[9] Millions of immigrants have come to New York as the first step toward making a life in the United States,[10] believing that the Statue of Liberty in fact welcomes the "huddled masses yearning to breathe free . . . ."[11] New York is home to millions of foreign-born residents—more than a third of the City's population.[12] The City has long served as a hub of international commerce, cultural exchange and diplomacy. Its international influences are woven into the fabric of everyday life experienced by NYU's students and scholars,[13] and its spirit infuses and amplifies NYU's culture of embracing diversity.

---

[9] NYU Mission Statement, *available at* www.nyu.edu/about.

[10] From 1892 to 1954 alone, over twelve million immigrants came to the United States through Ellis Island. *See* Ellis Island History, www.libertyellisfoundation.org/ellis-island-history.

[11] Emma Lazarus, "The New Colossus," Liberty State Park (1883) available at http://www.libertystatepark.com/emma.htm (last accessed March 6, 2017).

[12] Thomas P. DiNapoli, "The Role of Immigrants in the New York City Economy," New York State Comptroller Report 7-2016 (Nov. 2015), *available at* https://osc.state.ny.us/osdc/rpt7-2016.pdf ("Nearly three-quarters of the 4.4 million immigrants in New York State live in New York City . . . .").

[13] *Students Share International Experiences at Global Engagement Symposium*, NYU Arts & Liberal Studies (March 20, 2015), *available at* http://www.liberalstudies.nyu.edu/object/global.symposium ("[Students] presented on experiences that included installing a solar electricity system in a Nicaraguan village, independent research into NYU London's history as the headquarters of a musicians' club, and writing a policy report on asylum seekers in Tel Aviv.") (One

6

NYU's mission and values are embodied in the words of its current president, Dr. Andrew Hamilton, himself an immigrant.  In a letter to the NYU community addressing the January 27, 2017 Executive Order that preceded the Executive Order now at issue in these proceedings, Dr. Hamilton articulated the importance of free movement across borders in pursuit of scholarship and the harm arising from its unwarranted obstruction:

> As a scientist who studied and worked in four countries before becoming a citizen of the U.S., I know how important it is to be able to move across borders in peaceful pursuit of one's scholarship.  I know, too, more than most given my background and my field, how much goodwill the U.S. earns for itself through the openness of its education system and how widely those who study here can spread American values.  And I know, as well, that these developments are not just a matter of disrupted educational plans or lost opportunities or even damage to the academic enterprise; beyond all that, this order harms one of the most admired and cherished of American principles–religious non-discrimination itself.[14]

## II.    The Executive Order Significantly Harms NYU and Its Constituents.

By indiscriminately targeting individuals from the Muslim-majority countries of Iran, Libya, Somalia, Sudan, Syria and Yemen without any basis to believe that such individuals pose the slightest threat to the national security of the

---

student commented: "One of the main reasons I decided to study at NYU was the opportunity for global experiences.").

[14] Letter from Dr. Andrew Hamilton to NYU Community (Jan. 29, 2017), *available at* http://www.nyu.edu/about/leadership-university-administration/office-of-the-president/communications/the-recent-executive-order-on-immigration.html.

United States, the Executive Order improperly compromises the diversity that is central to NYU's identity and mission. Approximately 120 NYU students and ten scholars at the New York City campus alone come from the six Muslim-majority countries specified in the Executive Order. Many others from those countries would be discouraged or prevented by the Executive Order from joining them at NYU.

Courts have long emphasized the importance of promoting diversity and freedom in educational environments, recognizing that, due to the classroom's vital role as a "marketplace of ideas," constitutional protections are "nowhere more vital than in the community of American schools." *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967). "The nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, [rather] than through any kind of authoritative selection." *Id.* (internal citation and quotation marks omitted).

Diversity similarly "helps break down racial stereotypes, and enables [students] to better understand" those with different backgrounds. *Grutter v. Bollinger*, 539 U.S. 306, 330 (2003). As a result, diversity helps impart the "skills needed in today's increasingly global marketplace" by "expos[ing] [students] to widely diverse people, cultures, ideas, and viewpoints." *Id.* at 330; *see also Keyishian*, 385 U.S. at 603. Recognizing these benefits, the Supreme Court has

8

held that the Constitution protects a school's "right to select those students who will contribute the most to the 'robust exchange of ideas . . . .'"  *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 313 (1978); *see also Fisher v. Univ. of Tex. at Austin*, 133 S. Ct. 2411, 2417 (2013) (recognizing compelling governmental interest in "the educational benefits that flow from a diverse student body"); *Washington v. Trump*, 847 F.3d 1151, 1159 (9th Cir. 2017) (recognizing a school's ability to assert harm on behalf of its students, including harm to the university's ability to accomplish its global mission).

By its very nature and goals, implementation of Section 2(c) of the Executive Order would threaten that constitutionally protected diversity.  *See Fisher*, 133 S. Ct. at 2417; *Grutter*, 539 U.S. at 328 (observing that a school's "educational judgment that such diversity is essential to its educational mission is one to which we defer"); *Bakke*, 438 U.S. 265 at 313; *see also Bery v. City of N.Y.*, 97 F.3d 689, 694 (2d Cir. 1996) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.") (quoting 11 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2948, at 440 (1973)).

The harm that will flow from the Executive Order is in any case manifest. By targeting the populations of six Muslim-majority nations for exclusion from the United States, the Executive Order will hinder NYU's efforts to expose

9

international students and scholars to a broad array of ideas and influences.  This

cross-cultural exchange buttresses key democratic traditions, such as free speech, a

free press,[15] free and fair elections, and freedom of assembly.[16]  By fostering a

culture of international exchange and dialogue, rather than fear and hatred, NYU's

international programs thus combat radicalization.[17]  Reducing this cross-cultural

exchange will deprive NYU of opportunities to share those key democratic

traditions with students from abroad.[18]  And in doing so, the Executive Order will

---

[15] Indeed, many NYU graduates of the Near Eastern Studies program have gone on to be respected journalists, helping shape the thoughts for millions of readers about life and culture in the affected regions. Jared Malsin, who graduated from NYU's Near Eastern Studies in 2010, is *TIME* magazine's Middle East bureau chief, and former West Bank and Gaza Palestinian news agency Ma'an chief English editor.  *See About – Jared Malsin*, *available at* http://jaredmalsin.com/about.html.  Habib Battah, who graduated from NYU's Near Eastern Studies and Global Journalism program in 2010, is a prominent journalist in *Al Jazeera* covering terrorism in the Middle East among other events. *See* Habib Battah Profile, Al Jazeera, *available at* http://www.aljazeera.com/profile/habib-battah.html.

[16] *See, e.g.*, United Nations Security Council Resolution 2178, adopted in September 2014, http://www.un.org/en/sc/ctc/docs/2015/SCR%202178_2014_EN.pdf (highlighting the need for "quality education for peace that equips youth with the ability to engage constructively in civic structures and inclusive political processes").

[17] *See, e.g., Preventing Violent Extremism Through Promoting Inclusive Development*, *Tolerance and Respect for Diversity*, United Nations Development Programme 11 (2016) (identifying as one strategy to prevent violent extremism "[p]romoting respect for human rights, diversity and a culture of global citizenship in schools and universities").

[18] *See, e.g., Study Away in the US and Around the World*, Studying Abroad | NYU, *available at* https://www.nyu.edu/academics/studying-abroad.html (video testimonials of NYU students studying abroad).

diminish the global reach of American universities and risk robbing the nation, and the world, of their potential contributions.

Beyond its impact on the NYU community's ability to disseminate important shared values, the Executive Order threatens NYU's own diverse international community, harming the University's current and prospective students, scholars and faculty.  In addition to the day-to-day cultural exchange that occurs at a diverse university, NYU has many programs that facilitate the understanding of other cultures, such as the Hagop Kevorkian Center ("the Center"), which focuses on Near Eastern studies and was created "to foster the interdisciplinary study of the modern and contemporary Middle East and to enhance public understanding of the region."[19]  To achieve this goal, it hosts events exploring topics such as "current events and policy issues relating to the middle east," some of which include discussions relating specifically to the six countries affected by the Executive Order.[20]  The Center also collaborates with "nearly 100

---

[19] *About*, Hagop Kevorkian Center for Near Eastern Studies, NYU, available at http://neareaststudies.as.nyu.edu/page/about.

[20] *See* http://neareaststudies.as.nyu.edu/page/upcomingevents/. For example, on February 15, 2017, the Center hosted two films about the Syrian refugee crisis, "District Zero" and "Siege."  On February 23, it hosted an event focused on Iran entitled "Picturing Urban Modernity: Tehran and its Cinematic Configurations, 1900s-1930s." See *Picturing Urban Modernity: Tehran and its Cinematic Configurations, 1900s-1930s*, New York University, available at http://neareaststudies.as.nyu.edu/object/kc.events.picturingurbanmodernity/.  Film screenings involving the Syrian refugee crisis took place on March 1 and  22.  *See On the Bride's Side*, Visual Culture, Loss and Resilience, New York University,

11

teachers from public and private schools across the New York metropolitan area to participate in Center-sponsored workshops on the Middle East," which allow Center-affiliated faculty to "share expertise on the Middle East with journalists and government agencies on a regular basis and discuss current events and policy issues at university and community events."  These programs are vital to public awareness, which is crucial to NYU's ability to serve as an educational institution "fitting for all and graciously open to all."[21]

From the joint master's degrees offered by the Center, to the graduate programs offered by the Middle Eastern and Islamic Studies program, the value of NYU's educational opportunities is predicated in substantial part on the quality and diversity of its faculty and students.  The Executive Order would interfere with numerous on-campus programs like these, which are central to creating an environment of intellectual and cultural exchange, and thus heightened international awareness and understanding, at a time when such understanding is more important than ever.[22]

---

*available at* http://neareaststudies.as.nyu.edu/object/kc.events.brides.side; *Not Who We Are*, Visual Culture, Loss and Resilience, New York University, *available at* http://neareaststudies.as.nyu.edu/object/kc.events.notwhoweare.
  [21]*See* NYU Mission Statement, *available at* www.nyu.edu/about.
  [22] *See, e.g.*, Nassir Abdulaziz Al Nasser (High Representative for United Nations Alliance of Civilizations), *UNOAC | Remarks |Parliamentary Assembly of the Mediterranean* (February 23, 2017), available at https://www.unaoc.org/2017/02/remarks-11th-plenary-session-parliamentary-assembly-of-the-mediterranean/ (commenting on the rise "of violence and

Finally, all students suffer when the diversity of ideas and backgrounds to which they are exposed is diminished. *See Fisher*, 133 S. Ct. at 2417. Unchecked, the Executive Order will have a direct and immediate impact on the large number of international students and scholars who wish to become affiliated with NYU or to participate in academic conferences at NYU in their fields.[23] Prospective students who have yet to enroll will be delayed or entirely prevented from beginning their academic careers.

At this juncture, staying the District Court's order enjoining the implementation of Section 2(c) of the Executive Order, or ultimately lifting the District Court's injunction, would substantially interfere with students from the targeted countries seeking to enroll in NYU's Summer Session, as prospective students will be deterred from even attempting to enter the country at this time.[24] If the duration of the Executive Order were extended, many more students and scholars with vast untapped potential would be prevented from achieving the

---

xenophobia against minorities" and remarking that "inclusiveness has become a pre-requisite for peaceful society" when it comes to "migration laws," and that "[p]romoting and strengthening dialogue is an essential tool to prevent and defeat violent and extremist ideologies").

[23] "MEIS Statement on Executive Order to Limit Entry of Middle Eastern Refugees and Immigrants," MEIS | New York University, *available at* http://meis.as.nyu.edu/object/statement_executive_order.

[24] *See* Executive Order § 2(c) (directing suspension "for 90 days from the effective date of this order").

13

success of which they are capable, harming them, the NYU community, and ultimately the world as a whole.

For example, Shadi Hedarifar, a prospective graduate student who was accepted to schools worldwide but wanted to study in the United States, may not be able to attend classes at NYU with worldwide leaders in her field.[25] Ms. Hedarifar has written that because of the January 27, 2017 Executive Order, her "entire future [was] destroyed in one second." After saving money for the application fees "that a whole family could live [on] for a month," Ms. Hedarifar's dreams of studying in NYU may well be shattered.[26]

An integral "[p]art of the business of a university [is] to provide that atmosphere most conducive to speculation, experiment, and creation." *Bakke,* 438 U.S. at 305 (quoting *Sweezy v. New Hampshire*, 354 U.S. 234, 263 (1957) (Frankfurter, J., concurring in judgment)). To preserve for NYU and its students and scholars the constitutionally protected benefits of diversity and the free exchange of ideas, and to eliminate the discriminatory exclusion from the United States of persons from Muslim-majority countries, this Court should decline to

---

[25] *See* Samantha Michaels, *I'm an Iranian Woman Whose Dream Is to Study in America. Here's My Message for Trump.*, Mother Jones (Jan. 29, 2017), http://www.motherjones.com/politics/2017/01/iranian-student-trump-immigration ("We Iranian students strongly believe that diversity in ethnicity, race, religion, and color is one of the greatest strengths of the United States. And Trump's Muslim ban will destroy this.").

[26] *Id.*

grant the stay and ultimately uphold the District Court's injunction of Section 2(c) of the Executive Order.

### III. The Executive Order Has the Same Unlawful Policy Outcomes as Its Predecessor, In Violation of the Equal Protection Clause, the Establishment Clause and the Immigration and Nationality Act.

The Executive Order states that its aim is to "replace" Executive Order 13769, signed January 27, 2017, and respond to judicial orders granted against the earlier Order by "exclud[ing] from the suspensions categories of aliens that have prompted judicial concerns and . . . clarif[ying] or refin[ing] the approach to certain other issues or categories of affected aliens."[27]  The Executive Order made various changes to the practices to be implemented under the prior Order, including removing Iraq from the list of countries whose nationals are subject to the 90-day suspension of unrestricted entry.[28]  But it nonetheless suffers from many of the same defects as the prior Order, and is animated by the same unlawful, discriminatory intent.

The revised Executive Order, like its predecessor, violates the Constitution's Equal Protection Clause, because it discriminates against individuals based on their religion and reflects a clear animus towards Muslims.  *See Bolling v. Sharpe*, 347 U.S. 497 (1954) (applying the Fourteenth Amendment's equal protection clause to the federal government through the Fifth Amendment).  Discrimination against a

---

[27] Executive Order § 1(i).

[28] *See id.* § 2(c).

protected class on the basis of overt animus is the most obvious and fundamental abuse of government authority against which the Equal Protection Clause was created to protect. *Vill. of Arlington Heights v. Metro Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977) ("When there is proof that a discriminatory purpose has been a motivating factor in the decision, . . . judicial deference is no longer justified."). As such, classifications based on religion or national origin are scrutinized to the highest degree. *Clark v. Jeter*, 486 U.S. 456, 461 (1988) (national origin); *Larson v. Valente*, 456 U.S. 228, 244 (1982) (religion). A law may fail to withstand scrutiny even if discrimination is not "the sole purpose of the challenged action, but only that it was a 'motivating factor.'" *Arce v. Douglas*, 793 F.3d 968, 977 (9th Cir. 2015) (internal citation omitted).

For similar reasons, the Executive Order violates the Establishment Clause of the Constitution. The "clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson*, 456 U.S. at 244; *McCreary Cty., Ky. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 866 (2005) (considering the "historical context" of the government act and the "specific sequence of events leading to [its] passage") (internal citation omitted). "[T]he Religion Clauses . . . and the Equal Protection Clause as applied to religion . . . all speak with one voice on this point: Absent the most unusual circumstances, one's religion ought not affect one's legal rights or duties or benefits." *Hassan v.*

16

*City of New York*, 804 F.3d 277, 290 n.2 (3d Cir. 2015) (quoting *Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 715 (1994) (O'Connor, J., concurring in the judgment) (alterations in original, internal quotation marks omitted)).

Finally, the Executive Order, like the one that preceded it, contravenes the letter and intent of the Immigration and Nationality Act of 1965 (the "INA"), exceeding the scope of presidential authority under that statute. The INA was enacted at the height of the civil rights movement, to combat the then-current system of national-origin quotas, which the nation's leaders believed to be "contrary to our basic principles as a nation."[29] The legislative history of the INA shows that its intent was to "remove from our law a discriminatory system of selecting immigrants that is a standing affront to millions of our citizens."[30] Section 202 of the INA effectuates that intent by prohibiting discrimination in

---

[29] 111 Cong. Rec. 24, 225 (1965) (statement by Senator Edward M. Kennedy). *See also id.* at 21, 778 (statement of Representative Paul Krebs that immigration rules based on national origin were "repugnant to our national traditions," and that "we must learn to judge each individual by his own worth and by the value he can bring to our Nation.").

[30] *Immigration: Hearings Before Subcomm. No. 1 of the Comm. on the Judiciary, House of Representatives, on H.R. 7700 and 55 Identical Bills,* 88th Cong. 901-02 (1964), *reprinted in* 10A Oscar Trelles & James Bailey, Immigration and Nationality Acts: Legislative Histories and Related Documents, doc. 69A (1979) 410 (remarks of Attorney General Robert Kennedy) (noting that the bill "would remove from our law a discriminatory system of selecting immigrants that is a standing affront to millions of our citizens").

admissions on the basis of national origin.  *See* 8 U.S.C. § 1152(a)(1)(A) (with

limited statutory exceptions, "no person shall receive any preference or priority or

be discriminated against in the issuance of an immigrant visa because of the

person's race, sex, nationality, place of birth, or place of residence."); *see, e.g.,*

*Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*, 45 F.3d 469

(D.C. Cir. 1995) (holding that Congress, in enacting Section 202, "unambiguously

directed that no nationality-based discrimination shall occur").  At oral argument

below, Appellants acknowledged that, pursuant to the Executive Order, "any

individual not deemed to fall within one of the exempt categories, or to be eligible

for a waiver, will be denied a visa," contrary to the plain language of Section

202(a)'s express prohibition.  On that basis, and because no authority clearly

indicated that the Executive Order fell within an exception to Section 202(a), the

District Court held that Appellees International Refugee Assistance Project, HIAS,

Inc., Middle East Studies Association of North America, Muhammed Meteab, Paul

Harrison and Ibrahim Ahmed Mohomed had shown a likelihood of success on the

merits that the Executive Order violated the INA.  *See Int'l Refugee Assistance*

*Project v. Trump* ("*IRAP*"), No. CV TDC-17-0361, 2017 WL 1018235, at *9, 10

(D. Md. Mar. 16, 2017).

     The President's authority under INA Section 212(f) to "suspend the entry of

all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the

entry of aliens any restrictions he may deem to be appropriate," *see* 8 U.S.C.
§ 1182(f), is circumscribed by Section 202's express and later-enacted prohibition
against discrimination on the basis of national origin.  In addition, any presidential
proclamation under Section 212(f) requires a legitimate finding that "the entry of
[the suspended] aliens or . . . class of aliens into the United States would be
detrimental to the interests of the United States."  *Id.*  As shown below, the
Executive Order violates both Section 202's unambiguous prohibition against
discrimination on the basis of national origin, and INA Section 212(f)'s
requirement that an exercise of presidential authority under that section be justified
by a legitimate finding that the admission of a suspended class of individuals is
against the interests of the United States.

The Executive Order specifically violates the Constitution and the INA
because it arbitrarily singles out six Muslim-majority countries as targets for its
ban.  This invidious discrimination is apparent from the text of the Executive Order
itself, its history, and the unsubstantiated pretext offered in support of the
Executive Order.

First, the plain text of the Executive Order's 90-day suspension of entry by
nationals of the six countries discriminates on the basis of religion against Muslims
by targeting all of the citizens of six Muslim-majority countries without a plausible
basis for doing so.  The text of the order further violates the Equal Protection

19

Clause and Establishment Clause of the Constitution and Section 202's prohibition against discrimination based on national origin.  The President's denial that the Executive Order is a Muslim ban is belied by its impact:  each of the targeted countries has a Muslim population of 90% or more.[31]  Three of the countries— Iran, Somalia, and Yemen—have Muslim populations of more than 99%.[32]

The Executive Order crosses from disparate impact into overt discrimination by exploiting and perpetuating stereotypes of Muslims.  The Order invokes "honor killings"[33] and "radicalized" foreign nationals.[34]  These terms are not "neutral," but carry very specific meanings aimed at a faith "singled out for discriminatory treatment."  *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 538 (1993) (holding that use of allegedly neutral terms "sacrifice" and "ritual" were evidence of singling out a particular religion in violation of the Establishment Clause).[35]

---

[31] Pew Research Ctr., "The Global Religious Landscape: a Report on the Size and Distribution of the World's Major Religions as of 2010," 47-50 (2012), https://goo.gl/HVoVJI (Libya is 96.6% Muslim, Syria 92.8%, and Sudan 90.7%).
[32] *Id.*
[33] Executive Order § 11(iii).
[34] *Id.* § 11(ii).
[35] That the language of the Executive Order is targeted against people of the Muslim faith becomes even more evident when one considers the leaked draft of the January 27, 2017 Executive Order, which included the phrase "violent religious edicts"—a transparent attempt to disparage Muslims as barbaric.  Daniel M. Kowalski, *Executive Order: Protecting the Nation from Terrorist Attacks by Foreign Nationals – White House (Draft, Unsigned, Undated)*, Lexis Nexis Legal Newsroom (Jan. 25, 2017), *available at* https://www.lexisnexis.com/

The call for public reporting of "honor killing" is a thinly-veiled attempt to paint Muslim men as domestic abusers.[36]  This blatant stigmatization of Muslims runs afoul of the Establishment Clause and Equal Protection Clause.  *See Hialeah*, 508 U.S. at 538; *Romer v. Evans*, 517 U.S. 620, 634 (1996) ("[L]aws of the kind now before us raise the inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected.").  It also reveals how the Executive Order does not satisfy INA Section 212(f)'s requirement of a "legitimate finding" that the admission of a suspended class of individuals is against the interests of the United States.  Domestic violence is a serious problem for people of all faiths and backgrounds, not just those from the six Muslim-majority countries.[37]

---

legalnewsroom/immigration/b/newsheadlines/archive/2017/01/25/executive-order-protecting-the-nation-from-terrorist-attacks-by-foreign-nationals-white-house-draft-unsigned-undated.aspx?Redirected=true ("We cannot . . . admit into our country . . . those who would place violent religious edicts over American law.").

[36] Executive Order § 11(iii) (calling for the Attorney General "to collect and make publicly available . . . information regarding the number and types of gender-based violence against women, including so-called 'honor killings,' in the United states by foreign nationals"); *see also* Leti Volpp, *Trump's mention of 'honor killings' betray the truth of his 'Muslim ban'*, The Hill (Feb. 22, 2017), *available at* http://origin-nyi.thehill.com/blogs/pundits-blog/immigration/320632-trumps-mention-of-honor-killings-betray-the-truth-of-his ("Honor killings stand in for the idea of Muslim barbarity.  Their invocation in the executive order helps make apparent that the 'foreign nationals' whose entry poses a terrorist threat are Muslim.").

[37] *See, e.g.*, *National Intimate Partner and Sexual Violence Survey 2010 Summary Report*, National Center for Injury Prevention and Control Division of Violence Prevention 40 (2010), *available at* https://www.cdc.gov/violenceprevention/pdf/nisvs_report2010-a.pdf (finding domestic violence occurs against intimate partners across all races and ethnicities).

In addition to being reflected in its text, the Executive Order's unconstitutional and illegal invidious discrimination is confirmed by a review of its history, including statements made by the President and others regarding its purposes. *See IRAP*, 2017 WL 1018235, at *15 ("[T]he record provides strong indications that the national security purpose is not the primary purpose for the travel ban."). White House Advisor Stephen Miller conceded when discussing the revised Executive Order that the changes "are mostly minor, technical differences," and "[f]undamentally, [it will be] the same, basic policy outcome for the country."[38] And much like the original,[39] the revised Executive Order is steeped in a background of the President's discriminatory statements that, without any evidence whatsoever, perpetuated the stereotype that people of Muslim faith are largely terrorists seeking to harm the United States.[40] President Trump has

---

[38] Taylor Link, *Stephen Miller admits the new executive order on immigration ban is same as the old*, SALON, Feb. 22, 2017, http://www.salon.com/2017/02/22/stephen-miller-admits-the-new-executive-order-on-immigration-ban-is-same-as-the-old/.

[39] *See, e.g., Trump,* 847 F.3d at 1167 ("statements by the President about his intent to implement a 'Muslim ban'" and evidence that the original Executive Order represented the effectuation of that intent undermined the Government's likelihood of success on appeal of injunction of the original Executive Order).

[40] *See, e.g.*, Press Release, Trump-Pence, Donald J. Trump Statement on Preventing Muslim Immigration (Dec. 8, 2015), https://www.donaldjtrump.com/press-releases/donald-j.-trump-statement-on-preventing-muslim-immigration (visited on Feb. 16, 2017). (campaign website that to this day still calls for a "shutdown of Muslims entering the United States"); Interview of Donald Trump on CBN News, YouTube (Apr. 11, 2011), https://m.youtube.com/watch?v=fWzDAvemJG8 (arguing that there is a "Muslim

22

repeatedly called for:  shutting down mosques in the United States,[41] suspicionless

surveillance of Muslims in mosques,[42] a registry for all practicing Muslims,[43] racial

profiling of all Muslims,[44] and a total ban of Muslims coming to the United

States.[45]

The administration's attempts to cloak this discriminatory intent in neutral

language are unavailing.  In July 2016, then-candidate Trump telegraphed his aim

to disguise the language of the Muslim ban to pass legal muster, when he noted

that he would refer to the Muslim countries on the basis of geographic location

rather than religious majority, because "[p]eople were so upset when [he] used the

---

problem" in the United States, and suggesting that the Koran teaches a "very
negative vibe" and "tremendous hatred").

[41] *See, e.g.,* Nick Gass, *Trump: 'Absolutely no choice' but to close mosques,*
Politico (Nov. 18, 2015), http://www.politico.com/story/2015/11/trump-close-
mosques-216008.

[42] *See, e.g.,* Lauren Carroll, *In Context: Donald Trump's comments
on a database of American Muslims,* Politifact (Nov. 24, 2015),
http://www.politifact.com/truth-o- meter/article/2015/nov/24/donald-
trumps-comments-database-american-muslims/.

[43] Vaughn Hillyard, *Donald Trump's Plan for a Muslim Database
Draws Comparison to Nazi Germany*, NBC News (Nov. 20, 2015),
*available at* http://www.nbcnews.com/politics/2016-election/trump-says-
he-would-certainly-implement-muslim-database-n466716.

[44] Transcript, Face the Nation, CBS News (Jun. 19, 2016),
http://www.cbsnews.com/news/face-the-nation-transcripts-june-19-2016-trump-
lynch- lapierre-feinstein/.

[45] Politico, Full text: Donald Trump 2016 RNC draft speech transcript (July
21, 2016), http://www.politico.com/story/2016/07/full-transcript-donald-trump-
nomination- acceptance-speech-at-rnc-225974.

word Muslim."[46]  Rather than a "rollback" of previous calls for a Muslim ban,

President Trump has characterized the Administration's new approach as an

"expansion" of his prior rhetoric.[47]  A prominent advisor to the Trump campaign,

Rudolph W. Giuliani recounted that President Trump wanted a "Muslim ban" and

had requested that Mr. Giuliani assemble a commission to show him "the right way

to do it legally."[48]  Plainer evidence of animus against Muslims would be difficult

to find.  *See Department of Agriculture v. Moreno*, 413 U.S. 528, 534 (1973) ("[I]f

the constitutional conception of 'equal protection of the laws' means anything, it

must at the very least mean that a bare . . . desire to harm a politically unpopular

group cannot constitute a legitimate government interest.").[49]

---

[46] Donald Trump Remarks in Manchester, New Hampshire, C-SPAN (Jun. 13, 2016), https://www.c-span.org/video/?410976-1/donald-trump-delivers-remarks-national- security-threats.

[47] *Id.*

[48] *Trump asked for a Muslim Ban Giuliani says – and ordered a commission to do it 'legally,'* Wash. Post (Jan. 29, 2017), *available at* https://www.washingtonpost.com/news/the-fix/wp/2017/01/29/trump-asked-for-a-muslim-ban-giuliani-says-and-ordered-a-commission-to-do-it-legally/?utm_term=.82e451dca6b8.

[49] Even if this was not the purpose, the indisputable perception of sect favoritism violates the Establishment Clause.  See *McCreary*, 545 U.S. at 883 (O'Connor, J., concurring) (finding violation of Establishment Clause because of "unmistakable message of endorsement to the reasonable observer"); *Cty. of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, 593-94 (1989) ("The Establishment Clause, at the very least, prohibits government from appearing to take a position on questions of religious belief or from 'making adherence to a religion relevant in any way to a person's standing in the political community.'") (quoting *Lynch v. Donnelly*, 465 U.S. 668, 687 (1984) (O'Connor, J., concurring)).  And the public perception of the original Executive Order is

The Administration's proffered interest in securing our borders is also merely pretextual, as the Order is both under and over inclusive. A statute or rule that is under and over inclusive in burdening a constitutionally protected interest is not narrowly tailored to achieve a compelling state interest, as required to satisfy the Equal Protection and Establishment Clauses. *See, e.g.*, *Miller v. Johnson*, 515 U.S. 900, 904 (1995). The Executive Order recites that its purpose is to "protect" its "citizens from terrorist attacks," and asserts that the targeted countries were identified as presenting "heightened concerns about terrorism and travel to the United States."[50] Yet by excluding hundreds of thousands of innocent refugees without a whiff of suspicion that they pose any danger, the Executive Order is wildly over-inclusive. *See Romer,* 517 U.S. at 632 (finding that a law failed rational basis review where "its sheer breadth is so discontinuous with the reasons offered for it that the amendment seems inexplicable by anything but animus toward the class that it affects"). The Executive Order does not provide any process to determine whether potential immigrants or refugees pose a threat. It

---

clear: it is a Muslim ban. *See* Public Policy Polling, *After 2 Weeks, Voters Yearn For Obama* 1, 4 (Feb. 2, 2017) (finding in poll conducted on January 30-31, 2017 that "52% of voters think that the order was intended to be a Muslim ban, to only 41% who don't think that was the intent"), https://goo.gl/1L5psC. *See also CNN/ORC Int'l Poll* 9 (Feb. 3, 2017) (55% think the Executive Order "is a ban on Muslims"), https://goo.gl/0xE98B. Although public polling regarding the new ban has not been conducted, "reasonable observers have reasonable memories, and our precedents sensibly forbid an observer to turn a blind eye to the context in which the [policy] arose." *McCreary*, 545 at 866 (internal citation omitted).

[50] Executive Order § 1(a)-(b).

simply denies them the opportunity even to apply for admission if they originate from the countries on the list.

Furthermore, the Executive Order is dramatically under-inclusive. Despite the proffered interest in security, the Executive Order does not include on its list of affected countries any of the home countries of the perpetrators of the September 11th, 2001 attacks.[51] Nor does it include countries connected to the perpetrators of more recent domestic attacks in San Bernardino, New Jersey or New York, Orlando, or Boston.[52] And tellingly, the Executive Order does not include any of the majority-Christian nations that are listed by the State Department as "terrorist safe havens."[53] *See Larson,* 456 U.S. at 244 ("[T]his Court has adhered to the principle, clearly manifested in the history and logic of the Establishment Clause, that no State can pass laws which aid one religion or that prefer one religion over another.") (internal citation and quotation marks omitted). Such under-inclusiveness also demonstrates discriminatory animus, as it reveals that the state's

---

[51] Pamela Engel, *Trump's immigration ban doesn't include the country most of the 9/11 hijackers came from*, Business Insider (Jan. 30, 2017), http://www.businessinsider.com/trumps-muslim-ban-saudi-arabia-911-2017-1 ("[T]he [initial] executive order doesn't apply to *any* of the countries where the 9/11 attackers were from.") (emphasis in original).

[52] Eric Levenson, *How many fatal terror attacks have refugees carried out in the US? None*, CNN (Jan. 29, 2017), *available at* http://www.cnn.com/2017/01/29/us/refugee-terrorism-trnd/.

[53] Chapter 5: Terrorist Safe Havens (Update to 7120 Report), U.S. Dept. of State, *available at* https://www.state.gov/j/ct/rls/crt/2015/257522.htm.

proffered interest is a pretext for animus against people of the Muslim faith.  *See*

*Hialeah*, 508 U.S. at 543.

## CONCLUSION

For the foregoing reasons, the Executive Order exceeds the scope of

presidential authority under the INA and violates the Equal Protection and

Establishment Clauses of the Constitution.  This Court should therefore refuse to

stay the District Court's injunction of Section 2(c) pending appeal and affirm the

District Court's injunction.


Dated:  April 4, 2017                          Respectfully submitted,

                                               /s/ Steven E. Obus
                                               _____

OF COUNSEL:                                    PROSKAUER ROSE LLP
                                               Steven E. Obus
Terrance Nolan                                 Seth D. Fiur
General Counsel and Secretary                  Tiffany M. Woo
New York University                            Eleven Times Square
70 Washington Square South, 11th               New York, New York  10036
floor                                          (212) 969-3000
New York, New York  10012                      SObus@proskauer.com
                                               SFiur@proskauer.com
                                               TWoo@proskauer.com

                                               Counsel for *Amicus Curiae*
                                               New York University

## CERTIFICATE OF SERVICE

I hereby certify that on April 4, 2017, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ Steven E. Obus
Steven E. Obus

## CERTIFICATE OF COMPLIANCE

This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it uses

a proportionally spaced typeface (Times New Roman) in 14-point.  It was prepared

using Microsoft Word.  It complies with the type-volume limits of Fed. R. App. P.

29(a)(5) because it contains no more than 6,500 words, which is half of the 13,000

words allowed for principal briefs under Fed. R. App. P. 32(a)(7)(B)(i).

/s/ Steven E. Obus
Steven E. Obus